Good morning, excuse me. May it please the court, I'm Elizabeth Newman representing Mr. Nevils. I'd like to begin with the sufficiency argument, which really boils down to whether the government proved beyond a reasonable doubt that Mr. Nevils was actually aware that as he lay asleep there was a gun on his lap and another gun leaning against his leg. It's not enough for anyone to say that he must have known this or he must have known that. The government had to prove it beyond a reasonable doubt. It looks like it's a case of circumstantial evidence and inferences that can be drawn from the evidence. Strong circumstantial evidence has been rejected in at least one permissible aren't enough when evidence, although terribly incriminating, just doesn't quite make it to the top of proving beyond a reasonable doubt a knowing and aware possession. You've got a man in a room or in an apartment rather on a couch. He's asleep. The door is open, the security door is open. The inner door is not only open but off its hinges and leaning against a wall. He doesn't have keys to the place. None of his belongings are there. The only identifiable thing that's in the apartment that's linked to a particular person is linked to somebody else, Thomas McCreary. There's a document in there with his name on it. The gun is in his lap. It's not in his hand. It's not underneath him. It's on top of him. He's been drinking heavily within just a few hours here and it took three women to get him into the apartment and lay him down on the couch. According to the PSR, he's only five foot seven and so I don't think it's really, at the time of the PSR, a hundred and fifty pounds I believe. So I don't think it's really a tenable notion that it's his massive girth that requires the assistance of three people to do this. No, he drank so much that they put him on his side so that if he threw up, he wouldn't choke. I think that's what Ms. Campbell means when she says they put him on his side so he wouldn't throw up. There's no fingerprints of his anywhere in the room that the government showed. The guns were tested. The ammunition inside them was tested. No fingerprints anywhere. The government did not find anybody else's the evidence showed. The evidence showed that the print man was not asked to test or test for prints, the cell phone that was on the table next to him or any of the drug wrappers or any of the items in Exhibits 101 through 106, which included a metal tray, drugs, drug wrappers, a cell phone, some... Counsel, when he wakes up, he doesn't say, hey, what are these guns doing here? He wakes up and says, my friends have abandoned me. They left me here. Yes. And he doesn't seem to be surprised in the least that he's got a machine gun sitting on top of him and a gun sitting by his leg. Or that he's got drug paraphernalia and cash and a cell phone sitting on the desk on the table next to him. Well, your honor, his reactions to waking up with cops pointing their guns at him, you know, LA police officers who say, you know, we saw the situation, we were very... we thought it was a very tense one, we drew our weapons, is also, you know, not recorded and, you know, we don't know what his reaction was to that. I think... Well, we have the testimony of what the officer said he said, right? And the jury was entitled to believe that if they wished. Yes, what the sergeant said when he asked him, you know, do you need medication? Are you feeling ill? Do you have any health conditions that, you know, we should know about now that we're taking you into my friends abandoned me. What, you know, I'm angry at them, essentially. But I don't really think that... But he didn't say, where did these guns come from? Whose guns are these? No... And he had been found in the apartment before. It was a known drug, it was a known... Government's right about that. Drug stash. I mean, this is a place that he was familiar with. He'd been caught dealing drugs there before. Not exactly, your honor. I think that's perhaps not an inference that's really supported by the record. He'd been arrested in the apartment and guns... At least one firearm and some drugs had been found there at the same time. But it's not the case, at least from this record, that he'd been caught dealing drugs or dealing in arms from that apartment before. He had been arrested in the apartment approximately three weeks before, which apparently resulted in a probation violation, but not new charges. I think that's a fair inference from the kind of cross-examination that Defense Counsel at trial was struggling with, with Officer Dylakova. But this isn't the only case, or the only instance in which a defendant was in a... Was associated with a place where he was ultimately arrested and the evidence was still found to be insufficient. In Ocampo, for example, the defendant and his wife were seen going and coming from a particular residence, which the court called the Iron Gate Residence, to distinguish it from another residence in the case. They had keys to the house. Their wedding album was in the house. Clothing of their approximate size, excuse me, was in the house. They went back and forth from the house. The cocaine was in a truck in the garage. The defendant had keys to the house. His print was on the truck on a window on the driver's side. There's no evidence that the truck was locked at the time. There's no evidence that the garage was detached from the house, and certainly none that it was, you know, something like a storage facility or really far-removed truck from the house. And so he was very clearly associated with that house. His print was even on the truck, which is certainly more than we have in in this case with Mr. Nevels. And yet the evidence was still found to be insufficient to support his, excuse me, his possession conviction because there was nothing really linking him with the truck. He didn't have a, he didn't have title to the truck, as far as the evidence showed. He didn't have keys to the truck, as far as the evidence showed. And so it was, so that in the words of the court's opinion in Vasquez-Chan, when there's an innocent explanation and an incriminating one, the government has to prove beyond a reasonable doubt that the incriminating one is the correct one. Vasquez-Chan is another case in which the defendants were very clearly associated with the location where the drugs were. What's the innocent explanation here? It's Ms. Campbell's explanation, Your Honor, that she and two other women dragged him so drunk he couldn't walk or stand and left him there, and that the in fact, in which there is drug activity and in which there is, there are firearms, and in which, you know, it's not as though this were a neighborhood in which these activities were unknown or very unusual. It's, you know, the innocent explanation is that he was left there and other people came in and were dealing. Or other people came in and left the guns there, perhaps as some sort of joke. But the explanation is that he was basically out and remained asleep. It was already dark when she and her friends left him there. They shut the door with nothing, no guns and no drugs. At most, three, three and a half hours elapsed before the police arrived, perhaps less. Did the government challenge the credibility of the woman who testified? The cross-examination doesn't appear to do so to me, Your Honor. It's in the record. She was asked, you know, how long were you drinking? How much did he drink? You know, could he stand? Was he passed out? You know, all things like that, but didn't suggest that she had any motive to lie, that she had any bias at all. I'm sorry, Your Honor. At three and a half hours, did he, did the officers testify to any smell of alcohol about him or any impairment at all? As far as I remember from the testimony, they didn't testify to anything like that at all. They didn't, they, I mean, they weren't asked about anything like that. Okay. And they certainly could have been by the defense as to whether they smelled alcohol on his breath or whether he reeked or whether he still had slurred speech or anything else. It didn't appear to be, at least from their testimony, they understood everything he said. It's not clear that he said anything to them. Well, he did when he woke up. He said it to Sergeant Coleman when Sergeant Coleman arrived some time later. That was Sergeant Coleman's testimony. They, my friends left, oh, excuse me, my friends left me here. Officer Klaus and Officer De La Coba, who were the ones who actually arrived at apartment six and arrested Mr. Nevels, they testified that they, when they pointed their guns at him and he woke up, he was asleep when they arrived. They did a security check. Both of them testified to that through the apartment. It's a small one, but it seems to have at least three rooms and probably a bathroom as well, the living room where he was, the kitchen where the lights were on, and a bedroom, which contained a closet where some of the evidence that the defense introduced was found. They did a security check or a perimeter check, an interior check, I think is how they described it, to make sure there was no one else in the apartment. He was still asleep, excuse me, all through that. And when they came back to him, he appeared to be They had their guns pointed at him, and they told him to get off the couch and prone out on the floor, which he did, and he was arrested. And their testimony doesn't report any words said, exchanged between the two, only commands from them to him. Okay. I'll give you a minute. Your time is up, but I'll give you a minute for rebuttal. Thanks, Your Honor. Good morning. May it please the Court, Sandy Leal on behalf of the United States. There was ample evidence to support the jury's finding that the defendant knowingly possessed the firearm and the ammunition. In this case, Los Angeles Police Department Officer De La Colva and Klaus testified that on that night at about 11.45 p.m., the defendant was discovered in a loaded .40 caliber pistol, leaning up against his left leg. They testified that the defendant was slumped over or laying in a position on the couch, with his right leg sort of dangling off, not really laying on his side. Just a short foot in front of him was the glass coffee table with small baggies of packaged marijuana and ecstasy, a cell phone and money. The defendant was the only person in apartment 6. Well, let me ask you, they testified that he was asleep, right? They testified that it appeared that he was asleep. It looked to them that he was asleep. Yes. Did the government contest that? No, Your Honor, we did not. The officers testified his eyes were closed. Based upon that record, a reasonable trier of fact could find that the physical location of the firearms on the defendant, leaning against his leg, on his lap, the drugs, the money in front of him, that they could find that he had actual possession of the firearms and ammunition. You also had Officer Klaus's testimony, which was really important about what happened when he ordered the defendant not to move. He appeared to immediately grab towards the lap area, the lap areas where the firearm that was described as heavy, large, appeared to be a machine gun, was laying. And that was his first movement. Only after that first movement did he then put his hands up. The jury could have reasonably inferred that the defendant was aware of the presence of that firearm, based upon his initial reaction. You also have Sergeant Coleman. How did the officer describe that reaction? I can tell you exactly how he described that. Did he say he made a gesture towards his lap? He, Officer Klaus, and I'm referring to ER 189, at that point, you know, his eyes, you know, kind of came full, fully open. And for a brief second, he appeared like he was going to, you know, grab towards his lap. And then he stopped and put his hands up. He appeared. And he also indicated that ER 198, he started to reach towards his, you know, center area, and then he put his hands up. I think the jury could have inferred that he was in an apartment that he apparently had to be carried, dragged, or walked into. He had been really drunk, according to Ms. Campbell's testimony. His first reaction is to go towards the area where a large weapon is. Did the government challenge the credibility of Ms. Campbell? The government did cross-examine Ms. Campbell and did try to elicit information about her testimony. She was very vague in her answers during cross-examination. Did you stand up in front of the jury and argue you can't believe her? Or should discredit her testimony? To the extent that her timeline did not, her timeline did not seem to have a lot of information. Ms. Campbell could not tell the jury when she, in fact, went to the baby shower, when it started. It was either noon one or two. She couldn't tell the jury when the shower ended. She couldn't, she didn't even provide the jury with the information as to where in the apartment complex the shower was. She said it was just in the courtyard. She indicated they were drinking. She didn't know when they stopped drinking. She didn't know exactly when she carried him into the apartment. Only through cross-examination did we elicit that she indicated it was when it was dark out. That's the only information she could provide. And then after dragging, walking, or carrying him into the apartment, she went out to the front area to continue drinking. So, to the extent that her testimony was very vague, the government argued that, yes, perhaps it's not a credible testimony. There's not a lot of facts there that Ms. Campbell said. She testified that when she left him, there were no guns there. Is that correct? Yes, she did. But there's no evidence presented to refute any inference that he didn't get up after he was left there. She testified that he had not passed out. He was conscious. Hold on, hold on. Could you, could you? What evidence is there to support an inference that after he was taken to the couch, he woke up, got the weapons, knew they were there, and then went back to sleep? You say that's a possible inference. What evidence is there to support that inference? First, the fact that Ms. Campbell testified that the defendant was placed on his side. She said she placed him on the side so in case he were to vomit. The testimony of Officer Klaus and Officer De La Cova are not consistent with that. They, in fact, testify, Officer De La Cova testified that he was lying on the couch, head to the left, legs to the right, right leg dangling off the couch, and one hand by his waist and one hand at his side. Officer Klaus testified that he was seated but slumped over a little, not really on his side. That testimony, a jury could reasonably infer that the defendant had moved since Ms. Campbell and the two other women placed him on the couch. You also had the testimony of Ms. Campbell that she shut the door. The door was off the hinges and leaning against the wall. There was a metal gate. The metal gate, when the officers arrived at the scene, was slightly open and that is a way that the officers were able to see in besides the fact that the screen door was, you could look through it. So that testimony provided the jury with the ability to infer that the defendant had moved since he was placed or seen by Ms. Campbell. Is it just as reasonable to infer that somebody else brought the guns into the apartment? The door was open. It was apparently an open apartment. Pretty accessible. It had been known as a place where drugs were sold. In this case, I don't believe so. I think that the evidence is not, I think the evidence pushes it over. You have the statements of Sergeant Coleman saying that the defendant's responses to his routine medical questions were not, first of all, I'm too sick, I'm drunk, I'm going to be sick. His testimony was also not that he was shocked that a heavy, large machine gun or described as a machine gun was laying on his lap or that there was another weapon at his left leg, that there were drugs in front of him. He didn't say he was confused about his surroundings. Instead, he testifies, or he, I'm sorry, he states that he is angry with his friends because they didn't wake him. A jury could reasonably infer from that statement that he's upset that his friends didn't alert him that the Los Angeles Police Department was at the complex when he had guns and drugs, well, guns on him and drugs in front of him. He was never indicted for the drugs, was he? He was not. He was not. The district court was somewhat troubled with the enhancement in the time of sentencing, correct? Yes, and the district court, in fact, did not impose that enhancement. She didn't think he had possession of the drugs? Yes, that's correct, because since that was not charged in the indictment, there was not testimony regarding the testing of the marijuana and the ecstasy on the coffee table. There was not testing regarding the drugs and the amount and quantity of the drugs. How much cash was on the table? The record before the court did not indicate how much cash was on the coffee table, and, in fact, I don't have that information. Sum it up for me. What's the best argument the government makes for knowledge? The defendant was the only person in the apartment when the guns and drugs were found. The defendant had the guns actually physically on him, as opposed to all the cases cited by the defendant referring to constructive possession. This was actual possession. The guns were on him. The gun was described as very heavy and large, like a machine gun. The guns were loaded, loaded to the extent that there was actually ammunition in the chamber. A trigger just had to be pulled. The initial movements by the defendant when he was ordered not to move were towards his lap area where the gun lay. His statements to Sergeant Coleman that he was angry that he was not warned by his friends. No reaction about being intoxicated. No evidence in the record that he had any type of slurred speech or was intoxicated and needed any type of medical treatment. Instead, he was just able to answer the questions and answer that he was angry that he was not warned, that the police were here. Okay. Is that it? Yes, on that issue. Well, your time is up. You've got 12 seconds left. Thank you. Thank you, Your Honor. As far as the gate, the security gate being open, Officer Klaus testified that the running man, who ultimately ended up in Apartment 2, was the one who opened it. Question, do you know if he opened the door? Answer, I believe so. It's on page 174 of the excerpts. As government counsel was speaking, I quickly looked through Sergeant Coleman's testimony, which is in the excerpts, and I didn't see anything to suggest that he was ever asked by the defense or by the government about Mr. Neville's state of intoxication or lack thereof. So the evidence in the record is an absolute blank as to that. As to being the only person inside, I think this is really different from a case where the inside is not accessible to others. The inside here is an open room with a door that's simply open to everybody, apparently. The gun is on him, and it's heavy and loaded, says the government. True, which would explain why, if you're waking up with something unexpected and heavy on you, you might reach towards it before realizing that two police officers have their guns pointed at you and deciding not to do any sort of further investigation but merely raise your hands. As far as his slurred speech or lack thereof, the evidence is simply a blank as to that, and so no inference can really be drawn about that, could be drawn by the jury or can be drawn by this court. And finally, as to his statement, nobody warned me. I think that's really consistent with the conduct of a man who'd been arrested in that very apartment three years ago. It may be consistent, but isn't that why we have a jury to resolve these things? It's also consistent with the government's case. Yes, Your Honor. I think that that is one reason we have a jury system to resolve these things. But on the other hand, there are cases on sufficiency and insufficiency issues where the jury has also been asked to resolve some kinds of credibility issues as to people's conduct and so forth. I mean, I would point the court to Esquivel where the defendant says he's on his way on a road trip from Southern California to Washington State. But in a sufficiency case, Counsel, you're going to have to prove that no reasonable juror could have found your client guilty. But that's the same in Esquivel as well, also a sufficiency case. You have 12 unreasonable jurors in this case. Not necessarily, Your Honor, but I think that to the extent that the court statement is true, that's true also in Ruiz, Corral, Ocampo, Esquivel, Bernal, Vasquez, Chan, all of these sufficiency cases that we cited in our briefs. I realize I'm way over time. Thank you. Thank you, Your Honor. Submitted. Thank you, Your Honor.
judges: Nelson, Paez, Bybee